UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

   v.

LATEEF BUDD,

   Defendant.

**DECISION AND ORDER**

1:20-CR-06101 EAW

---

## I. BACKGROUND

Pending before the Court is a motion filed by defendant Lateef Budd ("Defendant") (Dkt. 78) seeking to revoke the detention order of United States Magistrate Judge Mark W. Pedersen (Dkt. 54). For the reasons set forth below, Defendant's motion is denied and he shall remain detained pending trial.

Defendant has been charged by way of an Indictment returned by a federal grand jury on July 16, 2020, with a narcotics conspiracy involving fentanyl, heroin, cocaine base, and cocaine, in violation of 21 U.S.C. § 846 (Count 1) and possession of firearms in furtherance of the narcotics conspiracy charged in Count 1, in violation of 18 U.S.C. § 924(c)(1)(A)(i) and 2 (Count 2). (Dkt. 138). Prior to the return of the Indictment, when Defendant was charged by criminal complaint, a detention hearing was held on May 6, 2020, before Magistrate Judge Pedersen. (Dkt. 65). Judge Pedersen issued an Order of Detention, finding by clear and convincing evidence that no condition or combination of conditions of release will reasonably assure the safety of any other person and the community, and by a preponderance of the evidence that no condition or combination of

conditions of release will reasonably assure Defendant's appearance as required. (Dkt. 54). Defendant sought review of that detention decision before this Court. (Dkt. 78).[1] After multiple adjournments at the request of the parties, the government filed a memorandum in opposition on August 24, 2020 (Dkt. 191), and oral argument was held before the undersigned on September 11, 2020 (Dkt. 197).

As requested at the oral argument, the government subsequently submitted a letter dated September 16, 2020, with enclosed photographs and videos from the "Barrel of Dolls" nightclub on November 3, 2019. Defendant's counsel responded by letter dated September 17, 2020, and the government submitted a further letter dated September 18, 2020. In response to the Court's inquiry after receiving those letters, both parties agreed that no further oral argument was requested.

## II.  STANDARD AND ANALYSIS

The Bail Reform Act of 1984, 18 U.S.C. §§ 3141 *et seq.*, authorizes and sets forth the procedures for the release or detention of a person pending trial, sentence, and appeal. The procedures and standards for release or detention of a person such as Defendant pending trial are set forth at 18 U.S.C. § 3142. *See United States v. Vasquez*, 113 F.3d 383, 388 (2d Cir. 1997). A defendant awaiting trial must be released unless the release will

---

[1] Because the Indictment had not yet been returned at the time Defendant sought review of the Magistrate Judge's detention order, the matter was opened before the undersigned as Case No. 6:20-mr-06071-EAW. Now that an Indictment has been returned, there is no longer any need for this separate miscellaneous case and the Clerk of Court is accordingly directed to close that matter.

present a risk of flight or dangerousness, or both, and no set of conditions can reasonably eliminate those risks. *See* 18 U.S.C. § 3142.

Although there is "only a limited group of offenders who should be denied bail pending trial," *United States v. Sabhnani*, 493 F.3d 63, 75 (2d Cir. 2007) (citations and quotations omitted), when there is "a strong probability that a person will commit additional crimes if released, the need to protect the community becomes sufficiently compelling that detention is, on balance, appropriate," *United States v. Chimurenga*, 760 F.2d 400, 403 (2d Cir. 1985) (citation omitted).

Because Defendant has been indicted for crimes in violation of the Controlled Substances Act, 21 U.S.C. 801 *et seq.*, for which the maximum term of imprisonment is ten years or more, and because he is charged with a violation of 18 U.S.C. § 924(c), there is a rebuttable presumption pursuant to 18 U.S.C. § 3142(e)(3)(A) & (B) that no condition or combination of conditions will reasonably assure the appearance of Defendant and the safety of the community if Defendant is released. *See United States v. Contreras*, 776 F.2d 51, 54-55 (2d Cir. 1985) (holding that a grand jury indictment establishes probable cause for purposes of the rebuttable presumption under the Bail Reform Act, and when faced with an indictment, the Court does not need to make an independent finding of probable cause). The presumption shifts to Defendant "a limited burden of production—not a burden of persuasion—to rebut that presumption by coming forward with evidence that he does not pose a danger to the community or a risk of flight." *United States v. Mercedes*, 254 F.3d 433, 436 (2d Cir. 2001). "[A] defendant must introduce some evidence contrary to the presumed fact[s] in order to rebut the presumption." *United States v. Rodriguez*, 950

F.2d 85, 88 (2d Cir. 1991). If a defendant satisfies this burden of production and rebuts the presumption, it does not disappear; rather, the presumption "remains a factor to be considered among those weighed by the district court." *Mercedes*, 254 F.3d at 436.

Even in a presumption case, at all times the government retains the ultimate burden of persuasion. *Id*. The burden of proof with respect to risk of flight is preponderance of the evidence. *Id*. On the other hand, the government must demonstrate by clear and convincing evidence that a defendant should not be released due to his risk of danger. *Id.*; *see also Chimurenga*, 760 F.2d at 405. Clear and convincing evidence "means something more than 'preponderance of the evidence,' and something less than 'beyond a reasonable doubt.'" *Chimurenga*, 760 F.2d at 405 (quoting *Addington v. Texas*, 441 U.S. 418, 431 (1979)). In other words, the evidence must support a conclusion of danger to the community "with a high degree of certainty." *Id*.

The statutory factors that a court must consider in deciding whether a defendant has rebutted the presumption of flight and danger, and whether there are conditions of release that will reasonably assure the appearance of the person as required and the safety of any other person and the community, are as follows:

> (1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence, . . . or involves . . . a controlled substance, firearm, explosive, or destructive device;
> (2) the weight of the evidence against the person;
> (3) the history and characteristics of the person, including—
>   (A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and

> (B) whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law; and
>
> (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release.

18 U.S.C. § 3142(g); *see also Mercedes*, 254 F.3d at 436 ("To determine whether the presumptions of dangerousness and flight are rebutted, the district court considers . . . [the factors set forth in] § 3142(g).").

In reviewing a detention order of a magistrate judge, a district judge should not simply defer to the judgment of the magistrate judge, but rather must reach her own independent conclusions. *United States v. Leon*, 766 F.2d 77, 80 (2d Cir. 1985). "When making its *de novo* review, the district court may rely on the record of the proceedings before the magistrate judge and may also accept additional evidence." *United States v. Marra*, 165 F. Supp. 2d 478, 481 (W.D.N.Y. 2001), *aff'd*, 21 F. App'x 66 (2d Cir. 2001).

### A. Nature and Circumstances of Charged Offenses

Defendant is charged with conspiring to distribute significant amounts of dangerous narcotics—400 grams or more of fentanyl; one kilogram or more of heroin; 280 grams or more of cocaine base; and five kilograms or more of cocaine (Dkt. 138 at 2)—and with possessing firearms (and aiding and abetting said possession) in furtherance of that narcotics conspiracy. If convicted as charged, Defendant faces a mandatory minimum sentence for Count 1 alone of 10 years and a maximum sentence of life in prison. If convicted of Count 2, Defendant faces a mandatory minimum consecutive sentence of 5 years.

B.     **Weight of the Evidence**

In assessing the weight of the evidence against Defendant, it is important to note that Defendant is presumed innocent, and "it is not the Court's role at this stage of the proceedings to assess [a defendant's] guilt or innocence." *United States v. Enix*, 209 F. Supp. 3d 557, 573 (W.D.N.Y. 2016). This factor "may be considered only in terms of the likelihood that the person will fail to appear or will pose a danger to any person or to the community," *United States v. Jones*, 566 F. Supp. 2d 288, 292 (S.D.N.Y. 2008) (quoting *United States v. Motamedi*, 767 F.2d 1403, 1408 (9th Cir. 1985)), and therefore it is generally considered the least important of the § 3142(g) factors. *See United States v. Boustani*, 356 F. Supp. 3d 246, 253 (E.D.N.Y. 2019) ("Because it is 'contrary to our legal system to impose punishment for a crime that a defendant has not yet been shown to have committed,' courts are cautious in affording undue weight to this factor." (quoting *Motamedi*, 767 F.2d at 1408)).

Here, the evidence against Defendant appears strong. Prior to execution of search warrants and the arrest of Defendant, he had been surveilled by law enforcement who detailed evidence allegedly indicative of Defendant's involvement in the narcotics conspiracy. (*See* Dkt. 1 at ¶¶ 175-178, 179-181, 270-274, 298-300, 306-310, 321-335). On April 30, 2020, search warrants were executed at a number of locations allegedly used to further the narcotics conspiracy, resulting in the recovery of cash, drugs, and other evidence relevant to the alleged narcotics conspiracy. (*See* Dkt. 191 at 6-8). Importantly, upon execution of the search warrant at an apartment at 300 Shady Run Lane in Penfield, New York (where Defendant purportedly lived with one of his girlfriends), Defendant was

personally present and law enforcement recovered a total of $358,504 in cash in the living room next to a money counter, expensive jewelry with a total appraised value exceeding $126,000 (including two men's Rolex watches valued at over $70,000), a loaded handgun in the nightstand of the bedroom, approximately 20 kilo wrappers with residue in the kitchen, and large quantities of drug paraphernalia including scales, cutting agents, and a hydraulic kilo press.  (*Id.* at 6-7).  In addition, at Defendant's residence located at 28 Blaydon Loop in Rochester, New York, law enforcement searched a Honda Accord that Defendant had been observed driving, and recovered a large quantity of kilo wrappers with cocaine residue.  (*Id.* at 7).

      **C.**      **Defendant's History and Characteristics**

According to the Pretrial Services Report prepared by the United States Probation Office on or about May 6, 2020, Defendant is 28 years old, he is a lifelong resident of Rochester, New York, he is close with his family who all reside in Rochester, and he has one child who lives with him and his girlfriend at the Blaydon Loop residence.  That residence is valued at $232,000, according to the Pretrial Services Report.  Defendant has owned his own lawn service business for the past 5 to 6 years, and according to his attorney, he employs two other individuals.  (Dkt. 81 at 28).  According to the Pretrial Services Report, Defendant's monthly income from this business is $1,500.

Defendant's criminal history as reported in the Pretrial Services Report reflects a felony arrest at the age of 15 for criminal mischief but no disposition is reported.  At the age of 18, Defendant was charged with a petit larceny misdemeanor and pleaded guilty to a violation of disorderly conduct for which he was adjudicated as a youthful offender and

sentenced to a conditional discharge. Approximately four months later, Defendant was charged with another petit larceny misdemeanor and he pleaded guilty to an attempted petit larceny misdemeanor, for which he was adjudicated as a youthful offender and sentenced to a conditional discharge with 25 hours of community service. Shortly thereafter, at the age of 19, Defendant was charged with several drug felonies, which were ultimately resolved in October 2010 with a misdemeanor plea to criminal possession of a controlled substance in the seventh degree, and Defendant was sentenced to three years probation. In 2013, Defendant pleaded guilty to a misdemeanor charge of attempted criminal mischief in the fourth degree, and was sentenced to 21 days in jail and a conditional discharge. Then, in 2016, Defendant was charged with several drug felonies, and he ultimately pleaded guilty to a felony of criminal possession of a controlled substance in the fifth degree: intent to sell, and was sentenced to one year in jail. The Pretrial Services Report indicates that Defendant was returned on a warrant in connection with that case and remanded without bail.

The Pretrial Services Report indicates that Defendant "attempted to jump out a window during his arrest and was brought to the hospital by law enforcement." At the detention hearing held before Judge Pedersen, the government represented that Defendant "was taken into custody outside of the apartment, because he ran from police through a glass second story window and jumped out of the apartment." (Dkt. 81 at 7; *see also id*. at 9 ("The largest amount seized in any one location, was in Mr. Budd's apartment in Penfield, $358,500. That is why he ran out of the second story glass window."); *id*. at 11 ("When police came into the apartment, he didn't just surrender. He jumped out of a glass window

in order to try to escape.")). At that detention hearing before Judge Pedersen, defense counsel did not dispute that Defendant was attempting to flee out a window when law enforcement entered the apartment, although he contended that the rationale was not nefarious as claimed by the government:

> Now, my client tried to get out the window. He wasn't trying to flee the police. He was trying to protect himself from what appeared to be dangerous activity, so as a consequence of that, he was seized.
>
> I commend the government for taking him to the hospital for treatment. He was evaluated and treated and continues to receive treatment for the cut he received on his forearm from the window that he tried to get out of.

(*Id.* at 28). This alleged fact seemed to play an important role in Judge Pedersen's detention decision and, in fact, he noted in the second paragraph of his Addendum to Detention Order: "When police executed a 'no knock' warrant at 300 Shady Run and yelled 'Police,' Defendant jumped out a second-story window to avoid capture (or, per his defense counsel, because he feared the residence was being robbed)." (Dkt. 54 at 4; *see also id.* at 7 ("[Defense counsel] posited that although Defendant did jump out of a window, he explained that police banged in the front door at six in the morning, were all in plain clothing, and acted very aggressively, so Defendant, to protect himself, jumped out the window.")).

The government has candidly acknowledged its mistake in making this statement to the Magistrate Judge. (Dkt. 191 at 3 n.1). Defendant did not, in fact, jump out of the window—instead, he was found by law enforcement inside the apartment in front of the broken window with injuries. The government contends that this means that Defendant

intended to jump out of the window, and defense counsel apparently agreed with this assessment, admitting at the detention hearing before Judge Pedersen that his client tried to get out the window when law enforcement entered the apartment. (*See* Gov't Letter dated 9/18/2020 at 2).

Finally, although not referenced in the Pretrial Services Report, in support of his motion to revoke the Magistrate Judge's detention order, Defendant represents that he suffers from Rhabdomyolysis "which causes the breakdown of damaged skeletal muscle," and argues that when considered in connection with the current COVID-19 pandemic, this favors Defendant's release. (Dkt. 78 at ¶ 20).

### D.  Nature and Seriousness of the Danger

Defendant is the main suspect in a November 3, 2019, shooting at the Barrel of Dolls nightclub. (Dkt. 1 at ¶ 412). The victim—identified by the government as the brother of the mother of one of Defendant's children (Dkt. 191 at 9)—has refused to cooperate with law enforcement (Dkt. 1 at ¶ 412). The Court has reviewed the police reports, video, and photographs submitted by the government, and they all support the government's contention that the victim and a person identified as Defendant exited the nightclub together, and shortly thereafter multiple patrons are seen fleeing the area. Although the shooting occurs off-camera, an individual identified as Defendant appears to be fleeing on the video immediately after the shooting. Moreover, the government has represented that it met with a witness who identified Defendant and the victim on the video, and who heard the shots and then saw the victim on the ground and Defendant running away. (*See* Gov't Letter dated 9/18/20). The police reports indicate that the victim received four gunshot

wounds, and that while uncooperative, he did state at one point that his "sister's 'baby daddy'" shot him after arguing.  (Dkt. 191-1 at 10).

In addition to this shooting incident, which is not part of the pending charges against Defendant, there is also the evidence that the government has gathered in connection with the pending charges—namely, the proof of Defendant's involvement in a large scale narcotics trafficking conspiracy and his possession of firearms in furtherance of that conspiracy (including the loaded handgun found at the Shady Run apartment when Defendant was arrested, where evidence of the narcotics conspiracy was also located).

### E.     Analysis of § 3142(g) Factors

The Court concludes that Defendant's ties to the area, including owning a home where he lives with his child and being close to his family who live in the area, rebuts the presumption that he is a flight risk.  The Court is not convinced that this evidence rebuts the risk of danger, but nonetheless will assume so for purposes of this Decision and Order.

Even with a rebuttal of the presumptions, consideration of all the § 3142(g) factors supports a finding by clear and convincing evidence that Defendant's release presents a risk of danger and by a preponderance of the evidence a risk of flight.  The crimes charged are serious and reflect dangerous activity.  Defendant faces significant penalties if convicted as charged, including a potential mandatory minimum prison sentence of 15 years.  Defendant's risks of flight and danger are further buttressed by the events of April 30, 2020—when Defendant was arrested after injuring himself trying to break through an upstairs window (that even his defense counsel seemed to acknowledge showed that he was trying to flee, although purportedly not for nefarious reasons).  Moreover, while

Defendant is presumed innocent, the evidence seized from the Shady Run apartment alone strongly supports a conclusion that Defendant was involved in a large scale and dangerous narcotics trafficking operation, with hundreds of thousands of dollars of cash and jewelry present at the location (even though Defendant's disclosed employment only resulted in monthly income of $1,500), a loaded firearm in the nightstand, and a significant presence of drug paraphernalia.  In addition, the evidence presented by the government reasonably supports a conclusion that Defendant shot the victim at the Barrel of Dolls nightclub on November 3, 2019.  Defendant's criminal history also counsels in favor of a finding that Defendant is a risk of danger and flight if released, including the bench warrant that was issued in connection with the felony conviction from 2016.

Although the Court concludes that Defendant presents a risk of flight, it may be that there are conditions that could reasonably protect against those risks, particularly when considered in connection with Defendant's close ties to the area and his family.  However, the Court need not resolve that issue, because it concludes that based on the § 3142(g) factors, the government has established by clear and convincing evidence that there are no conditions that could reasonably protect against Defendant's risk of danger to others and the community if released.  Finally, the COVID-19 pandemic and Defendant's medical condition do not warrant a different result.

### III.   CONCLUSION

For the foregoing reasons, Defendant's appeal of the magistrate judge's detention order (Dkt. 78) is denied.

- 13 -

SO ORDERED.

_____
ELIZABETH A. WOLFORD
United States District Judge

Dated: October 8, 2020
       Rochester, New York